UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-10464
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

STEVEN P. MOSER; LAVOYD WAYNE DOLLAR;
FRANKLIN ROLLIN JOHNSTON; BILLY MACK O'NEILL;
JERRY LYNN WILKINS; THOMAS D. GANDY,

Defendants-Appellants.

_____

Appeals from the United States District Court for the
Northern District of Texas
_____

September 18, 1997

Before GARWOOD, BENAVIDES, and STEWART, Circuit Judges.

BENAVIDES, Circuit Judge:

This direct criminal appeal involves six appellants who challenge, among other things, the sufficiency of the evidence to support their convictions, the jury instructions, the legality of the search, and the district court's denial of their motion to sever the trial. Finding no error, we affirm.

I.   FACTS AND PROCEDURAL HISTORY

In February of 1986, Appellant Franklin Rollin Johnston (Johnston) was engaged in the real estate business and suffered severe financial losses. Johnston attributed those losses on the downturn of the real estate market, oil business, and ultimately, the failure of the banks. After attending various seminars and

conducting research, he became convinced that the Federal Reserve Act was illegal inasmuch as banks were creating money out of thin air and lending only their "credit."

After having met Appellant Billy Mack O'Neill (O'Neill) in March of 1993, Johnston happened to meet O'Neill at a meeting involving the subjects of banking and money in May of 1993. O'Neill gave Johnston a packet of materials generated by the "Family Farm Preservation" entity of Tigerton, Wisconsin. The packet contained several court cases, blank "certified money orders" (CMOs), and articles explaining that banks legally cannot loan credit. The CMOs provided that they were payable:

> on demand, money of account of the United States, as required by law in Sect. 20 of Coinage Act of 1792 from the time of official determination of the substance of said money: or, in U.C.C. 1-201(24) Credit Money.

The money order further provided that it was redeemable at full face value when presented to L.A. Pethahiah in Tigerton, Wisconsin. If a financial institution presented the money order to Pethahiah, the institution would then receive a certified banker's check (CBC) in the same amount as the CMO. The CBC also contained the above limiting language.

Johnston gave the packet of materials to Appellant Jerry Lynn Wilkins (Wilkins), an attorney who Johnston had previously retained to do some work. Wilkins examined the materials and then advised Johnston, who in turn advised O'Neill, that he agreed with the information in the packet.

Johnston then formed USA First, an unincorporated business

2

organization in Waxahachie, Texas. Appellant Lavoyd Wayne Dollar (Dollar), a businessman and long time friend of Johnston, owned office space in Waxahachie and rented a suite of offices to Johnston for USA First. O'Neill worked for USA First, and Wilkins moved his law office to the offices of USA First. Johnston paid Wilkins $500 each week for the work he did for USA First. Each of those four men used CMOs from the Tigerton packet in an attempt to pay off debts with various lenders.

Shortly thereafter, Johnston put together a packet almost identical to the Wisconsin packet and began to sell it out of the offices of USA First for $300. The packet instructed that the user could fill out the six enclosed CMOs in any amount to pay off particular debts. Like the Wisconsin CMOs, these CMOs contained the above-quoted limiting language. The packet instructed the user to include 2-3 months extra interest and to ask for return of any overpayment. The institution to which a CMO was sent by certified mail was instructed to forward the CMO for redemption to O.M.B.-W.D. McCall at a post office box in Waxahachie.[1] The institution would then receive in return an item entitled "certified banker's check" (CBC) in the same amount as the CMO. The CBC would be signed by O'Neill. The institution was instructed to credit the CBC to the debtor's account. When the CBC was returned to USA First, O'Neill would stamp it "paid in full." There was no money behind the CMOs or CBCs. The packet itself referred to the CMOs as

_____

[1] The "O.M.B." designation was Billy Mack O'Neill's initials reversed. The post office box was controlled by USA First.

"pretend money."

The Texas Department of Banking sent a cease and desist letter to O.M.B.-W.D. McCall, admonishing that it had information that the business was violating state law regarding the unlicensed sale of payment instruments. The letter explained that such a violation was a third degree felony. The warning in the letter was ignored, and USA First continued to sell the packets containing the CMOs.[2]

In December of 1993, the offices of USA First were searched and records were seized. Shortly thereafter, Leo Hoad (Hoad) began working for USA First. Apparently, O'Neill and Hoad had some differences, and as a result, O'Neill left USA First.

Meanwhile, Appellant Steven P. Moser (Moser), who owned several pieces of mortgaged real property in Pennsylvania, was experiencing financial difficulties and, through a friend, heard of USA First in Texas. Moser subsequently talked with Johnston and purchased a packet. He used several of the CMOs in an effort to discharge his debt.

Appellant Thomas D. Gandy (Gandy) learned of USA First through a trust company employee in Kansas. Gandy purchased a packet, and used the CMOs as payments for existing loans. All six appellants attempted to use the CMOs. Ultimately, over 800 CMOs were issued by O.M.B.-W.D. McCall with a purported face value of over $61 million.

A grand jury charged the six appellants with one count of

_____

[2] In fact, the cease and desist letter was placed on the bulletin board at USA First as an object of disdain.

conspiracy to commit mail fraud and several substantive counts of mail fraud in violation of 18 U.S.C. §§ 371, 1341, and 2. The jury found Wilkins, Johnston, Dollar, and O'Neill guilty as charged. The jury acquitted both Moser and Gandy of conspiracy but found Moser guilty of one substantive count of mail fraud and found Gandy guilty of two substantive counts of mail fraud.

The district court sentenced the appellants as follows: Johnston and Wilkins, 96 months; Dollar and Moser, 21 months; O'Neill, 70 months; Gandy, 4 months and 16 days.

II. ANALYSIS

A. SUFFICIENCY OF THE EVIDENCE

All the appellants argue that the evidence is insufficient to sustain their convictions.[3] Johnston, Wilkins, and Dollar were convicted of one count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371 and substantive counts of mail fraud in violation of 18 U.S.C. § 1341 (Johnston, two counts; Wilkins, seven counts; and Dollar, five counts). Gandy and Moser were acquitted of the conspiracy count but convicted of mail fraud (Gandy, two counts; Moser, one count).

When reviewing the sufficiency of the evidence, this Court views all evidence, whether circumstantial or direct, in the light most favorable to the Government with all reasonable inferences to be made in support of the jury's verdict. *United States v.*

---

[3]     O'Neill attempts to adopt by reference Gandy's arguments that the evidence is insufficient to sustain his convictions. Because these are fact-specific challenges, O'Neill will not be permitted to adopt these arguments by reference. *United States v. Alix*, 86 F.3d 429, 434 n.2 (5th Cir. 1996).

5

*Salazar*, 958 F.2d 1285, 1290-91 (5th Cir.), *cert. denied*, 506 U.S. 863, 113 S.Ct. 185 (1992). The evidence is sufficient to support a conviction if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*. The evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt, so long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. *United States v. Faulkner*, 17 F.3d 745, 768 (5th Cir.), *cert. denied*, 513 U.S. 870, 115 S.Ct. 193 (1994).

To prove a violation of the mail fraud statute, 18 U.S.C. § 1341, the Government must prove beyond a reasonable doubt that there was (1) a scheme or artifice to defraud, (2) specific intent to commit fraud, and (3) use of the mails for the purpose of executing the scheme to defraud. *United States v. Shively*, 927 F.2d 804, 813-14 (5th Cir.), *cert. denied*, 501 U.S. 1209, 111 S.Ct. 2806 (1991). "Intent to defraud requires an intent to (1) deceive, and (2) cause some harm to result from the deceit." *Jimenez*, 77 F.3d at 97 (citation omitted). A defendant has the intent to defraud if he acts knowingly with the specific intent to deceive for the purpose of causing pecuniary "loss to another or bringing about some financial gain to himself." *Id*.

A conviction for conspiracy under 18 U.S.C. § 371 requires the Government to prove beyond a reasonable doubt (1) an agreement between two or more persons, (2) to commit a crime against the United States, and (3) an overt act in furtherance of the agreement

6

committed by one of the conspirators. *United States v. Krenning*, 93 F.3d 1257, 1262 (5th Cir. 1996).

### 1. Johnston

Johnston argues that his offer of payment in kind is an accepted banking practice and that the CMO and the CBC "could be valid if they had been accepted by the financial institution." He contends that if the bank had accepted the offer of payment he would not have been guilty of mail fraud. He then reasons that as a matter of law he cannot be guilty of conspiracy to commit mail fraud and mail fraud simply because the bank decided not to accept his offer of payment. This argument is specious. The evidence at trial clearly established that the CMOs and CBCs underlying his convictions are worthless. His convictions do not rest on the bank's decision to reject his offer of payment because that is not an element of the offenses. He does not otherwise challenge the sufficiency of the evidence to support his convictions. This argument is without merit.

### 2. Dollar

Dollar challenges the evidence to support his convictions for conspiracy and mail fraud, arguing that the Government failed to prove that he had the intent to defraud. He contends that the principals of USA First did not inform the users of the packet that they were engaging in a fraudulent act and that it was not manifest from the packet itself. He concedes that the materials advised the user not to tell the bank that he was using pretend money just like

7

the banks were using pretend money,[4] but he nonetheless asserts that this statement in itself does not reveal that the use of the CMOs was fraudulent. He further asserts that the "statement was in accord with USA First's theory that banks were unlawfully lending their credit; therefore, their debtors could respond *in kind*." (emphasis added). Dollar's argument proves too much. In other words, if the debtor is responding *in kind* to the bank's illegal conduct, the packet is at least implicitly stating that the debtor's conduct also is illegal.

In any event, viewing the evidence in the light most favorable to the verdict, the evidence is sufficient to show the requisite intent. In addition to the statement regarding the "pretend money," the jury could infer knowledge from the fact that Dollar paid $300 for a packet of materials that included money orders that could be filled out for any amount of money. Moreover, Dollar ignores that, after his CMOs were rejected, he filed a $49 million lien against a bank's employee.[5] Finally, although Dollar testified that he had no intent to defraud, the jury obviously found his testimony incredible. The evidence is sufficient to

---

[4] The packet advised the user that "just like in the children's story about the Emperor's new clothes, do not mention that your current credit money, the negotiable instrument, is pretend money, only speak of the bank's negotiable instruments as being pretend money or only promises while yours are according to U.C.C. law."

[5] Dollar testified that the $49 million figure was "[j]ust a number that we came up with." It was "just a figure that I pulled out of the air."

support Dollar's convictions.

    3.   Gandy

Gandy challenges both the sufficiency of the evidence to show (1) that he had specific intent to defraud and (2) that the mailing was in furtherance of the scheme to defraud.  In regard to his first challenge, Gandy states that his defense at trial was that he himself was a victim of the scam perpetrated by USA First and that he never intended to defraud anyone.  Specifically, Gandy asserts that he believed in good faith that he was simply refinancing his home at a lower interest rate through W.D. McCall.

At trial, Gandy called Jay Newland, who worked for Continental Trust Company in Wichita, as a witness.  Newland testified that he had informed Gandy that USA First was providing low interest loans and sent off for a packet that Gandy ultimately purchased.  Gandy believed the CMOs could work because a mutual acquaintance, Lonnie Canon, had used the CMOs to successfully discharge a debt.

Gandy further asserts that the evidence shows that even when he experienced problems with the CMOs, he still believed he could obtain refinancing through USA First.  He attributes this belief to the representations of Hoad, who led Gandy, among others, to believe that W.D. McCall was going to establish its own bank in Panama.  As late as April of 1994, Hoad sent a letter to Gandy indicating that he had been preliminarily approved for a loan of up to $200,000.  Hoad kept asserting that refinancing was right around the corner.  Gandy also relies on the fact that he paid off all his loans prior to the prosecution of this case.

The Government responds that Gandy knowingly used the CMOs to erase a debt that had bought him a valuable asset and then insisted that the lender was obligated to accept the bogus payment, accusing the lender of criminal fraud and threatening "non judicial remedies through the Uniform Commercial Code" against the institution's lawyer personally. The jury certainly could have found that this evidence contradicted Gandy's defense of good faith and supported a finding of his intent to defraud.

Further, as discussed above, the packet[6] contained language referring to the CMOs as "pretend money" and warned the user not to refer to the CMOs as pretend money. Additionally, the record reveals that in December of 1993, after learning there was a problem with the CMO he submitted to Union National Bank, Gandy represented to a loan officer that "he had used [W.D. McCall] several times in the past [and] had not had any problems with them . . . and that he had paid good money for [those] checks. . . ." Contrary to Gandy's representation, the evidence at trial demonstrated that Gandy had indeed been put on notice in November of 1993 that a CMO he submitted to Mulvane State Bank was not being accepted as payment. Thus, viewed in the light most favorable to the verdict, the evidence demonstrates that Gandy had the specific intent to defraud.

Gandy next argues that there is insufficient evidence to establish that the mailings were used for the purpose of executing

---

[6]     Gandy's exhibit 1A.

10

the scheme to defraud because the mailings alleged in counts 15 and 16 occurred after the alleged scheme had come to fruition, which he defines as occurring when the loan was deemed paid in full.

On November 12, 1993, Gandy submitted a CMO for $66,750 to Wichita Federal Savings & Loan. On November 15, 1993, Wichita Federal Savings & Loan released Gandy from any obligation on his loans and notified him they were paid in full. Count 15 alleged that on December 6, 1993, a CBC in the amount of $66,750 was mailed by W.D. McCall to Wichita Federal Savings & Loan. Count 16 alleged that on January 11, 1994, a letter was mailed to Wichita Federal Savings in connection with the scheme.

We reject Gandy's premise that the scheme came to fruition when the savings & loan initially notified him that his loan was paid in full on November 15, 1993. As the evidence at trial made abundantly clear, that was not the end of Gandy's efforts to make the scheme succeed. Although the receipt of the bogus CMO by the savings & loan caused it to send the release of the loan, the subsequent mailings of the CBC and the letter were "incident to an essential part of the scheme." *Schmuck v. United States*, 489 U.S. 705, 109 S.Ct. 1443, 1448 (1989). We therefore conclude that the evidence was sufficient to support the substantive counts of mail fraud.

4. Moser

Moser argues that the letter that underlies his sole conviction for mail fraud does not further the alleged scheme to defraud. The letter was from O'Neill to Wayne Paul (Paul), an

11

officer of Woodlands Bank. Paul testified that Moser had five loans at Woodlands Bank. In November 1993, Moser was behind in making payments, and the bank received a mailing from Moser with a letter stating that the enclosed CMO constituted:

> payment in full, on demand of the United States, as required by law at USC 371, from the time of official determination, as required by law at USC 371, from the time of official determination of the substance of said money, or in U.C.C. 1-202(24) credit money. . . . This certified money order is with a Private concern and must be mailed to O.M.B. W.D. McCall, P.O. Box 954, Waxahachie, Texas 75165.

Paul testified that the money order looked suspicious and that he did not understand the letter. The bank then sent the CMO to the Waxahachie address, enclosing a letter questioning the validity of the CMO.

In response, O'Neill sent the letter that is the mailing that is alleged in count 14. That letter provided in part that:

> I truly can understand your concern -- especially when your own regulatory laws require you to act within 24 hours or "before midnight" and seventy-two hours then changing from default to unlawful conversion. Also, the fact that millions of people have learned about the fraud perpetrated by the Federal Reserve System (a private corporation) through you and your "bank." Primarily, they are angry that you made "loans of credit" with no lawful consideration from you from the beginning.
>
> You created-from-thin-air-credit-loan of bad-check-loan of credit was bad enough, but you socked it to them with Usury when you had nothing of intrinsic value to charge interest on. **wow! what a deal!**
>
> You will find enclosed a Certified Bankers Check in the amount of $227,400.00 and your

12

accommodating signature will suffice to cancel the Certified Money Order now in your possession. You shall credit your customer, Steve Moser, with this amount and give him clear title to whatever you have a lien against that he is tendering payment on.

Moser argues that the tenor and language of the letter does not attempt to lull the victim into a false sense of security. He contends that "[t]he letter did not help the plan *succeed;* instead it created a risk of exposing the alleged scheme." (emphasis in brief). Moser makes much of the fact that Paul testified that he was not "impressed" with the letter. We have rejected a similar claim. In *United States v. Shively*, this Court explained that the failure of the letter to in fact lull the institution does not relieve a defendant of criminal liability. 927 F.2d at 815. Additionally, we stated that viewed in the light most favorable to the verdict, a reasonable juror could have concluded that the letter was intended to lull the bank. Any delay as a result of the letter would allow the scheme to continue. *Id*.

Likewise, in the instant case, any delay caused in foreclosure proceedings, or the like, would allow the scheme to continue. Moreover, although we understand Moser's argument, it would be absurd to conclude that the letter, which expressly directs the bank to credit Moser's account, was not sent for the purpose of executing the scheme.

Moser further asserts that the letter could not have aided in the execution of the scheme in that it was more likely to cause detection and deter any use of the CMO or CBC. The Supreme Court has rejected this view, holding that "[t]he relevant question at

13

all times is whether the mailing is part of the execution of the scheme to defraud as conceived by the perpetrator at the time, regardless of whether the mailings later, through hindsight, may prove to have been counterproductive and return to haunt the perpetrator of the fraud." *Schmuck v. United States*, 489 U.S. 705, 109 S.Ct. 1443, 1449-50 (1989).

Moser next asserts that there is no evidence that he was aware of the letter sent by O'Neill until he received a copy of the government's exhibits in September of 1995. "This court has held that when an individual does an act with the knowledge that the use of the mails will follow in the ordinary course of business, or when such use can *reasonably be foreseen, even though not actually intended*, then he/she causes the mails to be used." *Shively*, 927 F.2d at 815 (internal quotation marks omitted) (emphasis in opinion). Here, it was reasonably foreseeable to Moser when he sent the CMO that the use of the mails would follow in the ordinary course of business at USA First. Moser's claim of insufficient evidence is without merit.

5.    Wilkins

Wilkins continues to argue that the CMOs were not fraudulent instruments because it was credit for credit. The evidence clearly demonstrated that the CMOs submitted were worthless and that the users submitted those CMOs in an attempt to discharge real debts and keep valuable assets. Wilkins also argues that the evidence shows that he was simply a legal advisor. Wilkins ignores the evidence that he used a CMO in the amount of $137,700 in an attempt

14

to pay off his home mortgage.  Wilkins is not entitled to relief on this claim.

B.    MOTION TO SUPPRESS

This Court reviews *de novo* the determination whether a search or seizure was reasonable under the Fourth Amendment.  *United States v. Seals*, 987 F.2d 1102, 1106 (5th Cir.), *cert. denied*, 510 U.S. 853, 114 S.Ct. 155 (1993).  The evidence must be reviewed most favorably to the prevailing party.  *United States v. Shabazz*, 993 F.2d 431, 434 (5th Cir. 1993).

Johnston and Wilkins argue that the district court erred in failing to suppress the evidence seized from the business premises of USA First because the search warrant was a "general warrant," which gave the agents discretion to determine which items were to be seized.  "A warrant must particularly describe the place to be searched and the person or things to be seized."  *United States v. Kimbrough*, 69 F.3d 723, 727 (5th Cir. 1995), *cert. denied*, 116 S.Ct. 1547 (1996).   To determine whether the description of the items to be seized is sufficient, "a court must inquire whether an executing officer reading the description in the warrant would reasonably know what items are to be seized."  *Id*.

In the present case, the items to be seized were described in exhibit B, which was attached to the search warrant:

> Records relating to the production, advertising, ordering, sale, mailing and shipment of material involved in the use of "Certified Money Orders" by U.S.A. First and O.M.B., W.D. McCall.  Such records, files and promotional material include but are not limited to promotional material advertising the money orders, printed material sold to those responding to the offer, listing of individuals purchasing the material, records

concerning the receipt of payment and shipment of orders, financial records including but not limited to all original canceled checks, and other items such as printing and reproduction equipment, all concerning the operation of U.S.A. First, which is property constituting evidence of the commission of a criminal offense; the fruits of the crimes; and property designated and intended for use and which is and has been used as a means of committing an offense concerning a violation of Title 18, United States Code, Section 1341.

Contrary to the appellants' contentions, the search warrant meets the particularity requirement. The above language sufficiently limited the agents' discretion by instructing them what items were to be seized. *Kimbrough*, 69 F.3d at 727.[7]

Wilkins next claims that the search was unreasonable because the agents executing the warrant violated the "knock and announce" rule contained in the Fourth Amendment and 18 U.S.C. § 3109.[8] "Under both the Fourth Amendment and the `knock and announce' statute, defendants bear the initial burden of establishing that an

---

[7] Johnston asserts that the affidavit was not attached to the warrant during the search and that the warrant did not expressly reference the affidavit. *See United States v. Layne*, 43 F.3d 127, 132 (5th Cir.) (recognizing that the test for particularity may be satisfied with supporting affidavits if warrant refers to affidavits), *cert. denied*, 514 U.S. 1077, 115 S.Ct. 1722 (1995). The warrant does, however, refer to the affidavit as establishing probable cause. More importantly, exhibit B (not the affidavit) was the document that limited the agents' discretion by describing with sufficient particularity the types of items to be seized, and exhibit B was attached to (and expressly referenced by) the search warrant.

[8] Section 3109 provides:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

unannounced entry actually occurred." *United States v. Fike*, 82 F.3d 1315, 1323 (5th Cir.), *cert. denied*, 117 S.Ct. 241 (1996). Wilkins acknowledges that this claim was not raised in the district court. Wilkins cannot show plain error in regard to this obviously fact-based claim. *See United States v. Calverley*, 37 F.3d 160 (5th Cir. 1994), *cert. denied*, 513 U.S. 1196, 115 S.Ct. 1266 (1995); *United States v. McCaskey*, 9 F.3d 368, 376 (5th Cir. 1993), *cert. denied*, 511 U.S. 1042, 114 S.Ct. 1565 (1994).

C.   ADMISSION OF EVIDENCE

This Court reviews the admission of evidence for abuse of discretion. *United States v. Coleman*, 997 F.2d 1101, 1104 (5th Cir. 1993), *cert. denied*, 510 U.S. 1062, 114 S.Ct. 735 (1994). Moser and Gandy argue that the district court erred in admitting evidence that Allan Kramer (Kramer), an unindicted coconspirator, used an O.M.B.-W.D. McCall CMO to purchase a residence from Mark Fetzer.   They argue that the evidence was irrelevant and prejudicial.   This conduct was alleged in the indictment as an overt act under the heading of "Thomas Gandy."   At trial, the Government stated that this act should not have been under Gandy's name in the indictment.

The witness who related this evidence testified on cross-examination that he did not know either Moser or Gandy. Additionally, at trial, the Government conceded that it had no evidence that Kramer knew Gandy, Moser, or Dollar.

Both Moser and Gandy were charged with conspiracy to commit mail fraud.   It appears that the only way this evidence was

17

relevant to Moser or Gandy was to the extent that it was evidence of the conspiracy. Assuming *arguendo* that the evidence was not relevant, Moser and Gandy cannot show prejudice because both were acquitted of the conspiracy count.

Moser and Gandy also argue that the district court erred in allowing Donelle Smith to testify regarding a CBC (Government's exhibit 28) that Ted Schalesky used to pay off a note in the amount of $232,234.62. Smith's testimony was introduced in connection with count 17 of the indictment, which charged O'Neill with a substantive count of mail fraud.

The Government argues that there was no objection to Smith's testimony and thus this claim should be reviewed for plain error. Moser correctly asserts that previously, in connection with another witness's testimony, an objection was made that the Government's Exhibit 28 "was not relevant to the case being tried." That objection was overruled and the exhibit was admitted into evidence. However, as the Government states, there was no such objection to Smith's testimony. Even assuming for purposes of this appeal that the earlier objection preserved this claim, Moser and Gandy cannot establish error, much less harmful error, in that Smith's testimony was introduced in support of count 17, a count that charged O'Neill, not Moser or Gandy.

Moser next argues that the district court erred in admitting three documents that were used by the Government to impeach him during his cross examination. Moser describes the documents as "common law court pleading[s] seeking to keep Woodlands [Bank] from

18

foreclosing on the collateral that the bank had on the loans that were the subject matter of the criminal litigation."

Moser contends that the evidence and cross examination regarding "these extrinsic offenses had little probative value on the charges in the indictment and the probative value was substantially outweighed by the danger of unfair prejudice." Moser's contention that these documents are evidence of extrinsic offenses is puzzling. These documents were relevant in that Moser's loan from Woodlands Bank was the subject of count 14 (which charged Moser with a substantive count of mail fraud), and Moser's loan from Williamsport National Bank is listed as an overt act in the indictment.

Moser repeatedly testified on direct examination that he used the CMOs believing that he would in turn owe USA First the money it sent in the form of a CBC to his other creditors. The jury could have inferred from these exhibits that Moser did not intend to pay his debts but instead sought to stop the bank's litigation by invoking the jurisdiction of a bogus court. Additionally, the district court found that packets used by USA First contained information similar to statements made in the Government's exhibits, and thus the exhibits were relevant to the determination whether Moser was involved in the conspiracy. Moser has failed to show that the district court abused its discretion in admitting these exhibits. This issue is without merit.[9]

_____

[9] Wilkins also claims that the court improperly excluded evidence regarding his "credit for credit" defense. The record reveals that this defense was propounded at length, and the

19

D.   JURY INSTRUCTIONS

(1) Deliberate Ignorance Instruction

The district court charged the jury that:  "While knowledge on the part of a Defendant cannot be established merely by demonstrating that he was negligent, careless, or foolish, knowledge can be inferred if he deliberately blinded himself to the existence of a fact."  Gandy contends that this instruction was not warranted by the evidence.

"A district court has broad discretion in framing the instructions to the jury and this Court will not reverse unless the instructions taken as a whole do not correctly reflect the issues and law."  *United States v. McKinney*, 53 F.3d 664, 676 (5th Cir.) (citation and internal quotation omitted), *cert. denied*, 116 S.Ct. 261 (1995).  "The purpose of the deliberate ignorance instruction is to inform the jury that it may consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge."  *Id*. (citation and internal quotation omitted).  "It should only be given when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference."  *Id*. at 676-77.  In the instant case, both of those requirements were met.

At trial, Gandy claimed a lack of guilty knowledge: he believed that he was simply refinancing his loans through the use of the CMOs and CBCs.  In regard to an inference of deliberate

---

district court properly excluded some of the evidence as cumulative.

indifference, the evidence from the USA First packet established that Gandy was subjectively aware of a high probability of illegal conduct. The packet described the CMOs as "pretend" money and advised that they could be used to satisfy actual debts. Materials in the packet further advised threatening and harassing anyone who questioned the CMOs validity. Despite this overwhelmingly suspicious scheme, Gandy made no further inquiry as to the CMOs validity, thus supporting an inference of deliberate indifference on Gandy's part. The district court did not abuse its discretion in giving the deliberate indifference charge.

(2) Mail Fraud Instruction

In regard to the mail fraud instruction, the district court charged the jury that, to find a defendant guilty, the Government must prove beyond a reasonable doubt that:

> First: That the Defendant knowingly created or participated in a scheme to defraud, as alleged in the Indictment which is hereby referenced;
>
> Second: That the Defendant acted with a specific intent to commit fraud.
>
> Third: That the Defendant mailed something or caused another person to mail something for the purpose of carrying out or attempting to carry out the scheme.

The court further instructed the jury that "[a] `scheme to defraud' includes any scheme to deprive another of money, property, or of the intangible right to honest services by means of false or fraudulent pretenses, representations, or promises" and that "[a] representation may be `false' when it constitutes a half truth, or

21

effectively conceals a material fact, provided it is made with the intent to defraud."

All six appellants argue that "materiality" is an essential element of the mail fraud statute, and therefore the district court erred in failing to submit the question of materiality to the jury. Appellants argue that although materiality is not expressly mentioned in the mail fraud statute, 18 U.S.C. § 1341, such an element should be implied.[10]

They rely on the Supreme Court's holding in *United States v. Gaudin*, 515 U.S. 506, 115 S.Ct. 2310 (1995), that if materiality is an element of the offense, the question must be submitted to the jury along with the other essential elements.[11] In *Gaudin*, which involved the offense of making a false statement in violation of 18 U.S.C. section 1001, the Supreme Court simply assumed that materiality was an element of the crime because the issue was uncontested.

---

[10]    They are vague, however, as to how materiality relates to the elements of mail fraud.  Some of the appellants seem to imply that each mailing must contain a material misrepresentation.  We disagree.  Our precedent makes clear that each mailing does not even have to be fraudulent in itself. *United States v. Shively*, 927 F.2d 804 (5th Cir. 1991).  Therefore, if materiality is an element, the question would be whether the scheme to defraud involved material misrepresentations or omissions. *Cf. United States v. Cochran*, 109 F.3d 660, 667-68 n.3 (10th Cir. 1997) (explaining that although materiality is not an independent element of *wire fraud* prosecution, "fraud has always required that misrepresentations or omissions be material to be actionable").

[11]    A material statement was defined as having "`a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed.'"  *Gaudin*, 115 S.Ct. at 2313 (brackets in opinion) (quoting *Kungys v. United States*, 485 U.S. 759, 770, 108 S.Ct. 1537, 1546 (1988)).

Prior to *Gaudin*, in the context of a civil RICO claim, this Court explained that materiality was not an element of the offense of mail fraud. *Abell v. Potomac Insurance Co*, 858 F.2d 1104, 1129 (5th Cir. 1988), *vacated on other grounds*, 492 U.S. 914, 109 S.Ct. 3236 (1989). Since *Gaudin*, in the context of determining whether the evidence was sufficient to sustain a mail fraud offense, this Court has assumed without deciding that materiality was an element of the offense of mail fraud. *United States v. Manges*, 110 F.3d 1162, 1174 (5th Cir.), *petition for cert. filed*, (No. 97-315) (Aug. 19, 1997).

Acknowledging that there was no objection to the instruction,[12] the appellants argue that the omission constituted plain error. *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770 (1993). The first step in the *Olano* plain-error analysis is to determine whether the district court's lack of a materiality instruction constituted error.

As this Court did in *Manges*, we assume for purposes of this appeal that materiality is an element of mail fraud, and thus, the district court's failure to submit it to the jury constituted error, which satisfies the first prong of *Olano*.

In regard to the second prong, we must determine whether the error is "plain." In *Olano*, the Supreme Court opined that the error must be plain "under current law," but did not decide whether that was at the time of trial or on appeal. Recently, the

---

[12]    In his brief, although Johnston correctly states that he adopted the objections of his codefendants to the court's charge, none of his codefendants made this objection.

Supreme Court clarified that "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal-- it is enough that an error be `plain' at the time of appellate consideration." *Johnson v. United States*, 117 S.Ct. 1544, 1549 (1997).

As set forth above, prior to *Gaudin*, this Court opined that materiality is not an element of mail fraud. *Abell; see also United States v. Faulhaber*, 929 F.2d 16, 18 (1st Cir. 1991) (rejecting argument that jury should have received materiality instruction because the only issue is whether there is a scheme or artifice intended to defraud). More importantly, subsequent to *Gaudin*, this Court has yet to hold that materiality is an element of the mail fraud statute. It is clear to us that the error is not "plain" under current law, that is, at the time of appellate consideration. *See Johnson*, 117 S.Ct. at 1549. As such, the appellants are constrained from showing that the mail fraud instruction constituted plain error.


E.    DISMISSAL OF JUROR

During the instant trial, Wilkins' wife was arrested as she attempted to carry a loaded handgun through a security checkpoint at the courthouse. Based on this incident, a motion for mistrial was filed. The district court held a hearing and thereafter dismissed one juror who had been observed in the vicinity of the security checkpoint around the time Mrs. Wilkins was stopped.

Gandy, Wilkins, Moser, and O'Neill contend that the district

court erred in failing to question either the dismissed juror or the remaining jurors to determine whether any other juror had witnessed the incident. We are not persuaded. The appellants' assertion that another juror might have witnessed the incident is pure conjecture.

During the hearing, one of the defense attorneys testified that when Wilkins' wife was stopped at the checkpoint it seemed like the normal every-day search procedure, and he surmised that the jurors did not know what was going on either. As stated by the district court, "[a] board-certified criminal defense attorney with over twenty years in trial experience did not know what was happening until he `squeezed it out of the security guards.'" After listening to the evidence, the district court concluded that the safest course of action was to dismiss the one juror who had been identified without questioning other jurors and risking undue emphasis on the matter. The court's final instructions to the jury provided that anything seen or heard outside the courtroom was not evidence and must be entirely disregarded.[13] We conclude that the district court did not abuse its discretion in its handling of the allegation of outside influence on the jury. *See United States v. Ramos*, 71 F.3d 1150, 1153-54 (5th Cir. 1995), *cert. denied*, 116 S.Ct. 1864 (1996).

F.    JOINDER AND SEVERANCE

1.    JOINDER

---

[13]    Additionally, the court instructed the jury throughout the trial not to partake of any media coverage of the trial.

Relying on Rule 8(b) of the Federal Rules of Criminal Procedure, Gandy argues that he was misjoined for trial with the other defendants because the allegations in the indictment and the evidence at trial demonstrated not one single conspiracy, but rather two or more separate and distinct conspiracies. At a minimum, Gandy argues, there were two conspiracies: the first involving the issuance of CMOs and CBCs by Leonard Peth, operating as L.A. Pethahiah/Family Farm Preservation, in Tigerton, Wisconsin; and the second involving the issuance of CMOs and CBCs by Johnston and O'Neill, operating as O.M.B.-W.D. McCall, in Waxahachie, Texas.

"To determine whether an indictment charges separate conspiracies or a single conspiracy, we consider whether the alleged facts reveal a substantial identity of facts or participants. A single conspiracy can be found when the indictment adequately shows a singular conspiratorial objective . . . ." *United States v. Lindell*, 881 F.2d 1313, 1318 (5th Cir. 1989), *cert. denied*, 493 U.S. 1087, 110 S.Ct. 1152 (1990). Simply because the indictment does not charge each defendant "with active participation in each phase of the conspiracy does not constitute misjoinder." *Id*.

In the instant case, the indictment alleged the following scheme:

> The defendants would issue or cause to be issued worthless certified money orders made payable to private citizens, banks, mortgage companies, and other financial institutions and creditors. The worthless certified money orders would be used to pay off personal and consumer debts, forestall foreclosure of property, and acquire real and personal

26

property, or title thereto, free and clear of any encumbrances.

The defendants would direct the creditor to forward the worthless certified money order to the issuer to be redeemed at full face value.

The issuer, upon receiving the worthless certified money order from the creditor, would issue a worthless certified banker's check in the same amount as the worthless certified money order and send the worthless certified banker's check back to the creditor. L.A. Pethahiah and O.M.B., W.D. McCall were fictitious names used by the issuers.

The defendants would demand that the creditor "zero balance" their accounts and threaten legal action, including filing liens against the creditors and criminal prosecution, if the worthies certified money orders or banker's checks were not accepted as full payment of the debt and would file liens against and sue creditors, their employees, government officials and others to intimidate and harass them and cloud the title to properties.

Although the scheme set forth in the indictment and the evidence at trial did involve the issuance of CMOs and CBCs from both L.A. Pethahiah and O.M.B.-W.D. McCall, we are satisfied that there was only one conspiracy charged and proved. The Government did not attempt to prove that the defendants conspired with the persons involved in the scheme in Wisconsin. The evidence established that O'Neill obtained the information and materials from the Wisconsin operation and gave them to Johnston, who had Wilkins examine them. Johnston then constructed a packet based on the information from the Wisconsin materials. The packet sent out by Johnston referenced Family Farm Preservation in Tigerton, Wisconsin. The evidence indicates that the materials from

27

Wisconsin were used to launch this scheme and thereafter were duplicated. In short, the evidence supports the Government's theory of a single, overarching conspiracy, rendering joinder appropriate. *Lindell*, 881 F.2d at 1318.

2. SEVERANCE

Johnston, Wilkins, Dollar, Gandy, and Moser argue that the district court erred in refusing to hold separate trials. Under Rule 8(b) of the Federal Rules of Criminal Procedure, the initial joinder of the appellants for trial was legitimate because they were charged with having conspired with each other.[14] *United States v. Elam*, 678 F.2d 1234, 1250 (5th Cir. 1982). The district court's decision of whether to grant a severance under Rule 14 because of prejudice is reviewable only for an abuse of discretion. *United States v. Stotts*, 792 F.2d 1318, 1321 (5th Cir. 1986); see also *United States v. Salomon*, 609 F.2d 1172, 1175 (5th Cir. 1980) (to establish an abuse of discretion of the district court, a defendant must show that he received an unfair trial and suffered compelling prejudice against which the trial court was unable to afford protection). An appellant must demonstrate something more than the fact that a separate trial might offer him a better chance of acquittal. *United States v. Berkowitz*, 662 F.2d 1127, 1132 (5th Cir. 1981).

(a) Dollar

The district court denied the severance motion, opining that

---

[14] As discussed above, we reject Gandy's argument that he was improperly joined with the other defendants because there were two separate conspiracies.

28

the defendants' defenses were not mutually antagonistic. Dollar concedes that this was true to a certain extent "because each defendant, to some degree, contended that he believed in the USA First material and did not possess an intent to defraud." He claims, however, that the defenses presented by the six appellants fell into two distinct categories. Dollar asserts that, besides offering the defense of lack of intent, he argued to the jury that he had been duped by Wilkins, Johnston, and O'Neill "into believing that the USA First program would work." Dollar argues that he was prejudiced because "if the jury disbelieved the principals with respect to their protestations that they believed in the USA First program and possessed no intent to defraud, the jury would also convict [him], disregarding his further defense that he was duped into using the program by O'Neill, Johnston, and Wilkins." We disagree for two reasons. First, the jury could have rejected the defense of O'Neill, Johnston, and Wilkins and still believed that Dollar was duped by them. Second, and perhaps more importantly, on cross examination, Dollar testified that Johnston was enthusiastic about and believed in the validity of using the CMOs. Dollar's testimony also indicated that he thought Wilkins believed the CMOs were legal. Under those circumstances, Dollar's defense is not in conflict with the other defendants.

(b) Moser

Moser argues that the district court erred because there were two groups of defendants, the principals (Johnston, O'Neill, and Wilkins), and the group in which he fell, users of the packets.

29

The first group's defense was defending the program. On the other hand, his defense was that the first group of defendants kept him in the dark regarding the illegality of the CMOs. Moser argues that his defense conflicted with the first group's defense and that his attorney "specifically rejected trying to defend the allegations the way Mr. Johnston and Mr. Wilkins chose to do, i.e. defending the packet." These defenses are not necessarily conflicting in that the jury's rejection of the first group's defense does not inexorably lead to a rejection of Moser's. Also, as in Dollar's case, we are not convinced that Moser actually attempted at trial to point a finger at the first group. Upon inquiry by the court, Moser stated that he did not think that the people at USA First deceived him or "tried to hide the ball" from him. In any event, in light of the fact that the jury acquitted Moser of the conspiracy count and one substantive count of mail fraud, Moser cannot show compelling prejudice.

(c) Johnston

Johnston argues that he was prejudiced by certain evidence that would not have been admissible if a severance had been granted. Johnston points to Moser's testimony that USA First (Johnston's company) did not inform him that the Texas Department of Banking had issued a cease and desist order and that the CMOs could be illegal. Johnston ignores that the cease and desist order would have been admissible against Johnston in a separate trial. Even assuming *arguendo* that some of the complained of evidence

30

would not have been admissible in a separate trial, "Severance is not required merely because the government introduced evidence admissible against certain defendants." *United States v. Walters*, 87 F.3d 663, 671 (5th Cir.) (internal quotation marks and citation omitted), *cert. denied*, 117 S.Ct. 498 (1996). Johnston cannot show compelling prejudice. This is especially true in light of the district court's frequent instructions to the jury to consider the evidence as to each defendant separately and individually,[15] Johnston has failed to show the district court abused its discretion in denying his severance motion.

> (d) Wilkins

Wilkins generally argues that his defense was different from the others but does not elaborate. Thus, he has utterly failed to show the compelling prejudice required. In any event, as set forth above, we conclude that the district court's instructions were sufficient to cure any possible prejudice. *Walters*, 87 F.3d at 671.

> (e) Gandy

Gandy argues that even if his initial joinder with the other appellants for trial was proper, the district court erred in denying his motion for severance because he suffered compelling prejudice from the evidence introduced against his codefendants. In view of the previously mentioned instructions given by the

---

[15] This Court has held that, even when two defendants accuse each other of the crime for their respective defenses, severance is not warranted when the court instructs the jury to consider the evidence as to each defendant separately and individually. *United States v. Walters*, 87 F.3d 663, 671 (5th Cir. 1996).

district court and the jury's *acquittal* of Gandy on the conspiracy count, he has not shown compelling prejudice.  In conclusion, the district court did not abuse its discretion in denying the motion for severance.

G.    SENTENCING

Dollar and Wilkins argue that the district court erred in assessing their offense levels.  Under U.S.S.G. § 2F1.1, a defendant's base offense level is increased according to the amount of loss caused by his fraud.  A district court's finding of amount of loss is reviewed for clear error.  *United States v. Hill*, 42 F.3d 914, 919 (5th Cir.), *cert. denied*, 116 S.Ct. 130 1995).

The commentary to § 2F1.1 provides some guidance:

> [I]f an intended loss that the defendant was attempting
> to inflict can be determined, this figure will be used if
> it is greater than the actual loss.  . . .  For example,
> if the fraud consisted of selling or attempting to sell
> $40,000 in worthless securities, or representing that a
> forged check for $40,000 was genuine, the loss would be
> $40,000.

§ 2F1.1, comment. (n.7).

Dollar's presentence report (PSR) provided that the loss intended by Dollar was $704,000, which is the face value of the worthless CMOs that Dollar had caused to be issued.  Wilkins' PSR provided that the loss intended by Wilkins was $61 million.  That figure is the total amount of CMOs issued pursuant to the scheme. The district court found that amounts attributed to Dollar and Wilkins in their respective PSRs were accurate.

Relying on the fact that there was no actual loss in the instances in which they personally used (or when Wilkins assisted

32

others in using) the CMOs, Dollar and Wilkins argue that there was insufficient evidence to prove that they did not intend to repay the loans. "When reviewing the calculation of an intended loss, we look to actual, not constructive, intent, and distinguish between cases in which `the intended loss for stolen or fraudulently obtained property is the face value of that property' and those in which the intended loss is zero because `the defendant intends to repay the loan or replace the property.'" *Id.*

The Government asserts that the district court's findings regarding the amount of intended loss are consistent with the jury's verdict that the appellants were liable for intentionally participating in a scheme to defraud creditors by sending creditors bogus CMOs. Although we recognize that the appellants ultimately paid their loans, in view of their previous attempts to coerce the institutions to accept the bogus money orders, one is not left with the definite and firm conviction that the district court made a mistake regarding their intent to defraud. Thus, the findings regarding the amount of loss the appellants intended cannot be deemed clearly erroneous.[16]

H.  BIAS

---

[16]  Wilkins also purports to challenge an upward departure from the guideline range by the district court. Wilkins is mistaken. The district court did not depart from the guideline range. It appears that Wilkins is challenging the district court's decision to assess four points (as opposed to the two points recommended in the PSR) for his role in the offense under U.S.S.G. section 3B1.1(a). In light of the evidence adduced at trial, Wilkins has not shown that the district court clearly erred in finding that Wilkins was an organizer or leader. *United States v. Barretto*, 871 F.2d 511, 512 (5th Cir. 1989).

Wilkins asserts that the judge was biased because he felt threatened by Wilkins. Immediately prior to sentencing Wilkins, the court advised him of its concerns and gave Wilkins an opportunity to seek a recusal. Wilkins declined. As such, Wilkins's complaint is either waived or untimely. *Cf. United States v. York*, 888 F.2d 1050 (5th Cir. 1989) (finding untimely a motion for new trial based on disqualification of judge when defendant previously aware of circumstances alleged as basis for disqualification).

With respect to the remaining arguments of the appellants, we have considered briefs and arguments of counsel and the pertinent parts of the record, and conclude there is no error requiring reversal.

For the above reasons, the convictions and sentences of Johnston, Wilkins, O'Neill, Dollar, Moser and Gandy are AFFIRMED.