# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 12-41113

United States Court of Appeals
Fifth Circuit

**FILED**

April 15, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

LOREN WILLIS

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 9:11-CR-28-1

Before DENNIS and PRADO, Circuit Judges, and BROWN, District Judge.*

PER CURIAM:**

Appellant Loren Willis, along with Gerard Longo and Michael Rambarran, were indicted on charges of violating three separate provisions of the Lacey Act. The Lacey Act is a conservation law that prohibits trade in wildlife, fish, and plants that have been illegally taken, transported or sold. *See* 16 U.S.C. § 3371–78. The defendants were charged with conspiring: to submit a false label for fish transported in interstate commerce, in violation

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

** Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-41113

of 16 U.S.C. § 3372(d)(1)–(2) ("Count 1"); to transport fish in interstate commerce in violation of Texas law, thus violating 16 U.S.C. § 3372 (a)(2)(A) ("Count 2"); and to commit a Lacey Act Violation involving the sale or purchase of fish with a market value over $350, in violation of 16 U.S.C. § 3373(d)(1)(B) ("Count 3"). Longo pleaded guilty to Count 2, and Rambarran pleaded guilty to Count 1. The Government dismissed the remaining charges against them.

Willis went to trial on all three counts. At the close of the evidence, Willis moved for a judgment of acquittal, arguing with respect to Count 3 that the evidence was insufficient to show that the market value of the fish he had sold or purchased exceeded $350. The district court reserved its ruling on the motion until after the jury trial and later issued a written order denying it. The jury acquitted Willis on Count 1 (conspiracy to falsely label fish for interstate commerce), but found him guilty on Counts 2 and 3— conspiring to illegally transport fish in violation of Texas law and conspiring to illegally sell or purchase fish in violation of the Lacey Act with a market value of over $350. The district court sentenced him to serve nine months in prison and one year of supervised release. On appeal, Willis contends that the trial court erred in: (1) not instructing the jury on entrapment and (2) denying his Motion for Judgment of Acquittal.

## BACKGROUND

Loren Willis ran a commercial fish importing and exporting business out of West Palm Beach, Florida, where he lived. In the course of his business, Willis took a trip with a Japanese client to fish for alligator gar in Texas.

Although Willis had a federal fish and wildlife permit that allowed him to import and export wildlife at designated ports throughout the United States, including the port of Houston, Texas, in order to fish for gar in Texas

and export fish caught in the wild in Texas, Willis needed additional licenses and permits, specifically: (1) a nonresident recreational fishing license, which costs $58; (2) a nonresident general commercial fisherman's license, which costs $189; (3) a freshwater nongame fish permit, which costs $60; and, (4) a wholesale fish dealer's license, which costs $825. Neither Willis nor co-conspirator Longo nor the Japanese client obtained the needed licenses or permits.

After arranging for the services of Kirk Kirkland, a premier fishing guide, at a price of $750 per day, Willis called the Houston office of the Fish and Wildlife Service ("FWS") on July 26, 2010 and spoke with FWS Special Agent Marty Hernandez about a planned trip to fish alligator gar in Texas. He told Hernandez that the trip was on behalf of a Japanese client. Willis explained that in Japan a six-foot gar could sell for nearly $40,000, and a four-foot gar for $20,000. Not familiar with the specifics of exporting live fish overseas, Hernandez advised Willis to call the FWS inspection office at the Houston airport for information about exporting gar to Japan.

Following his phone conversation with Special Agent Hernandez, Willis called the FWS office at the Houston airport and spoke with Inspector Bradley Wendt, who told Willis that in order to ship live fish from Texas he would need to comply with the regulations promulgated by the Texas Parks and Wildlife Department ("TPWD"). Wendt directed Willis to contact TPWD for information about the licenses and permits he would need under the regulations. Willis never contacted TPWD before embarking on the fishing trip.

For his part, Hernandez called James Stinebaugh, a fellow special agent with FWS. Through Hernandez, Stinebaugh learned that Willis planned to come to Texas and that Willis planned to engage Kirkland. Stinebaugh approached Kirkland about being a paid confidential informant, a

position which Kirkland accepted. Stinebaugh also engaged Randy Button, a Texas game warden, to serve undercover as Kirkland's boat mate on the fishing trip.

The fishing trip took place from September 6 through September 9, 2010. Accompanying Willis were co-conspirator Gerard Longo, client Akira Masuda, river guide Kirk Kirkland, and TPWD undercover agent Randy Button.

During the trip, not only Kirkland but also undercover agent Button repeatedly told Willis that he needed Texas licenses and permits to fish for and sell gar. In fact, the evidence suggests that Willis was aware of the license requirements, as he told co-conspirator Longo to "keep quiet" about how they caught the fish.

On the third day of the fishing expedition, Willis left the others fishing and went to the FWS office at the Houston airport to meet with DeMarion McKinney, an inspector at the agency. Willis told McKinney that he wanted to ship live fish to Japan. Willis explained that he had a Florida fishing license. McKinney told Willis, however, that he would need a Texas license. McKinney directed Willis to call Robert Goodrich, a Texas game warden, who could instruct him on Texas law in this regard. It appears that Willis did not contact Goodrich until July 2011, by which time he had already been indicted.[1] Willis did, however, go ahead and schedule an inspection with FWS at the airport for September 12, 2010. Willis did not show up for the appointment.

By the conclusion of the trip on September 9, 2010, the group had caught six or seven alligator gar, of which only three survived. Willis

---

[1] Willis disputes this, claiming that prior to coming to Texas he talked to both Goodrich and Button about Texas licensing requirements. However, Willis points to no evidence entered at trial to support this claim.

obtained a fourth gar by buying it from Kirkland's father for $200. At that point, Willis asked Kirkland to put down four gar as the quantity on the invoice. Kirkland refused, telling Willis that he was only giving him an invoice for one "because that's what I'm selling you."

For the four gar, Masuda paid Willis $15,000. Willis decided to forego shipping the fish out of Houston, as he had originally planned, and instead would ship them from Miami.

After missing his appointment with FWS at the Houston airport, Willis, with co-conspirator Longo, crated up the four gar, put them in a van, and shuttled them back to Florida. Once in Miami, the two men met with representatives from Ornamental Fish Distributors ("Ornamental"), a Miami export company that specializes in shipping tropical fish. Willis had used the company in the past. Together with Adam Nielson, an Ornamental employee, Willis and Longo went to the Miami airport. There, Nielson presented the FWS with a declaration form. Because the declaration form indicated that the fish were wild-caught (as opposed to captive-bred), the inspector told Nielson that they were subject to inspection.

Nielson returned to the inspection office the next day, requesting that the fish be re-designated as captive-bred instead of wild-caught. The inspector instructed Nielson to have his supervisor, Mike Rambarran, contact the inspection office. Rambarran did so, informing FWS that he wanted to change the fish from wild-caught to captive-bred on the declaration form and that he had an invoice proving the fish came from Texas. Rambarran then submitted a new declaration form indicating that the four gar were captive-bred. Nielson signed the form, and FWS accepted it. The four gar arrived safely in Tokyo on October 1, 2010.

No. 12-41113

## STANDARD OF REVIEW

The first issue is whether the trial court erred in not instructing the jury on entrapment *sua sponte*. Willis did not raise the defense before the district court. Accordingly, the plain error standard applies. *See, e.g.*, *United States v. Benavidez*, 558 F.2d 308 (5th Cir. 1977).

Plain error review requires four determinations: "[1] whether there was error at all; [2] whether the error was plain or obvious; [3] whether the error affected the defendant's substantial rights; and [4] whether this court should exercise its discretion to correct the error in order to prevent a manifest miscarriage of justice." *United States v. Dominguez-Alvarado*, 695 F.3d 324, 328 (5th Cir. 2012); *see also United States v. Puckett*, 556 U.S. 129, 135 (2009). This court will exercise its discretion to correct plain error "only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Puckett*, 556 U.S. at 135 (internal quotation marks and alterations omitted).

The second issue presented is whether the trial court erred in denying Defendant's Motion for Judgment of Acquittal on Count 3. When a defendant makes a motion for a judgment of acquittal that the district court denies, the appellate court reviews that decision *de novo* applying the sufficiency of the evidence standard. *United States v. Lopez-Urbina*, 434 F.3d 750, 757 (5th Cir. 2005). "The test for reviewing the sufficiency of the evidence is whether a reasonable jury could conclude that the relevant evidence, direct or circumstantial, established all of the essential elements of the crime beyond a reasonable doubt when viewed in the light most favorable to the verdict." *United States v. Fountain*, 277 F.3d 714, 717 (5th Cir. 2001). Furthermore, Defendant's Motion for Judgment of Acquittal involves an issue of statutory interpretation in that the district court was required to interpret how the $350 requirement in the Lacey Act is calculated. That question, like any

No. 12-41113

question of statutory construction, is reviewed by this court *de novo*. *United States v. Kay*, 359. F.3d 738, 742 (5th Cir. 2005).

## DISCUSSION

## I.

"[E]ntrapment is an affirmative defense"; therefore, the burden is initially on the defendant to "show [that] he was induced to commit a criminal act by a government agent and that he was not predisposed to commit the act without the inducement." *United States v. Thompson*, 130 F.3d 676, 689 (5th Cir. 1997) (internal quotation marks and citation omitted).

Considering that entrapment is an affirmative defense to a violation of the Lacey Act, a defendant must show more than that "a Government agent has provided the accused with the *opportunity or facilities* for the commission of the crime." *United States v. Brace*, 145 F.3d 247, 260 (5th Cir. 1998) (en banc) (internal quotation marks and citations omitted) (emphasis in original). In order to establish the defense, "a defendant must 'make a prima facie showing of (1) his lack of disposition to commit the offense and (2) some governmental involvement and inducement more substantial than simply providing an opportunity [] to commit the offense.'" *United States v. Stephens*, 717 F.3d 440, 444 (5th Cir. 2013) (quoting *United States v. Theagene*, 565 F.3d 911, 918 (5th Cir. 2009)). Stated differently, "[t]he critical determination in an entrapment defense is whether criminal intent originated with the defendant or with the government agents." *United States v. Bradfield*, 113 F.3d 515, 521 (5th Cir. 1997). In examining a defendant's predisposition to commit the offense, the court is to look at (1) the defendant's "eagerness to participate in the transaction," and (2) the defendant's "ready response to the government's inducement offer." *United States v. Chavez*, 119 F.3d 342, 346 (5th Cir. 1997) (internal quotation marks and citation omitted).

7

No. 12-41113

Only after the defendant has made out a prima facie showing of entrapment by showing both elements—lack of predisposition and governmental inducement—is the defendant entitled to an entrapment instruction by the court. *Stephens*, 717 F.3d at 444. If the defendant can make this prima facie showing, he shifts the burden "to the government to prove beyond a reasonable doubt that the defendant was disposed to commit the offense before the government first approached him." *Theagene*, 565 F.3d at 918.

Willis points to no evidence in the record that indicates that, at trial, he made out a prima facie case for entrapment. He has failed to show that he was (1) not predisposed to commit the crime, or (2) given substantial inducement by the Government. First, based on the record and by defendant's own admission in his appellate brief, it was Willis who originated the idea of fishing and selling gar after speaking with Akura Masuda, his Japanese client. Because of his commercial fish exporting business, Willis of his own accord planned a trip to Texas to catch gar. That Willis had already devised the plan for the fishing trip before receiving what he alleges to be assistance from the Government is apparent from the manner in which he approached the Government to inquire into permits and licenses. Willis reached out to Government officials for advice on how to proceed, then when he learned he needed licenses in Texas to proceed lawfully, he ignored the advice and failed to follow through with obtaining the necessary licenses. Government agents—including Hernandez, Wendt, McKinney, Kirkland, and Button—instructed Willis, on various occasions, that he needed Texas licenses and permits to both fish and sell gar. Therefore, the Government cites significant portions of the record evidencing that Willis was predisposed to his crimes before any encounter with Government agents.

8

No. 12-41113

Second, the actions of the undercover agents on the boating trip are not in dispute. This was a sting operation, and, as this Court has previously held, sting operations by themselves do not constitute entrapment. *United States v. Gutierrez*, 343 F.3d 415, 420 (5th Cir. 2003).

On the record before this Court, it cannot be said that the district court committed plain error in not instructing the jury on entrapment. Accordingly, this court affirms the district court on this issue.

**II.**

A district court may set aside a verdict and enter a judgment of acquittal on its own or upon the motion of the defendant if the evidence is insufficient to sustain a conviction of an offense. Fed. R. Crim. P. 29. The district court, however, must uphold a jury's verdict as long as a reasonable jury could have found each of the essential elements proven beyond a reasonable doubt. *United States v. Yi*, 460 F.3d 623, 629 (5th Cir. 2006); *see also United States v. Fountain*, 277 F.3d 714, 717 (5th Cir. 2001). In undertaking its analysis, the court is to make all reasonable inference and credibility choices in favor of the jury verdict. *United States v. Gonzales*, 436 F.3d 560, 571 (5th Cir. 2006); *see also United States v. Rosalez-Orozco*, 8 F.3d 198, 200 (5th Cir. 1993). In reviewing a timely challenge to a conviction based on the alleged insufficiency of the evidence,"[w]e do not consider whether the jury correctly determined guilt or innocence, [only] whether the jury made a rational decision." *Lopez-Urbina*, 434 F.3d at 757 (citation omitted); *see also United States v. Moser*, 123 F.3d 813, 820 (5th Cir. 1997).

Here, after reviewing the evidence in the light most favorable to the jury verdict, with all reasonable inferences and credibility choices made in support of the verdict, the district court determined that a reasonable jury could have found, beyond a reasonable doubt, that the three fish taken without a license had a combined market value that exceeded $350.

No. 12-41113

The penalty provision of the Lacey Act provides that

Any person who—

(A) knowingly imports or exports any fish or wildlife or plants in violation of any provision of this chapter . . . or

(B) violates any provision of this chapter . . . by knowingly engaging in conduct that involves the sale or purchase of, the offer of sale or purchase of, or the intent to sell or purchase, fish or wildlife or plants with a market value in excess of $350, knowing that the fish or wildlife or plants were taken, possessed, transported, or sold in violation of, or in a manner unlawful under, an underlying law, treaty or regulation, shall be fined not more than $20,000, or imprisoned for not more than five years, or both.

16 U.S.C. § 3373(d)(1)(A)–(B). Applied to this case, Section 3373 requires the Government to prove that the value of the illegally caught fish had a market value in excess of $350. The word "fish" can refer to either a single fish or multiple fish. Thus, it is debatable whether the Government must prove that a single fish had a market value in excess of $350, which is Willis's position, or that the combined value of the gar exceeded $350. In this case, no direct evidence was adduced at trial to establish that a single gar had a value of over $350. However, the district court concluded that a reasonable jury could have found that the combined value of the fish exceeded $350.

While the Lacey Act does not specify and no case in this Circuit addresses whether the total value of the wildlife is to be aggregated in reaching the value of $350, it seems reasonable to do so when the illicitly captured, sold, or purchased wildlife were part of a single conspiracy or single commercial activity. This is what the district court here did, aggregating the value of each of the three illegally caught gar to arrive at a value in excess of $350. As this is a question of statutory interpretation, it is reviewed *de novo*. *Kay*, 359 F.3d at 742.

No. 12-41113

The district court relied upon the reasoning in a Ninth Circuit case, *United States v. Senchenko*, 133 F.3d 1153 (9th Cir. 1998). In *Senchenko*, the Ninth Circuit held that the Government could aggregate the value of bear parts to arrive at the requisite $350 value where the defendant's various acts were closely related and formed a single continuing scheme. *Id.* at 1157. According to *Senchenko*, aggregation of the value of wildlife for purposes of the Lacey Act is appropriate where all of the acts were part of a single conspiracy or single commercial activity. Under this reasoning, a reasonable jury in this case could have determined that the total value of the gar taken in violation of state law exceeded $350, as the district court found.

Without adopting the rule in *Senchenko*, we find that a reasonable jury could have found the market value of the gar to have exceeded $350 based on the $3,000 Willis paid to Kirkland for his guiding services. In *United States v. Todd*, this court stated that the "best indication" of the market value of wildlife caught illegally during a guided hunt "is the price of the hunt." 735 F.2d 146, 152 (5th Cir. 1984). In *Todd*, this court held that guiding services in the $1,000 to $5,000 range establish that defendants "conspired to take game with a market value exceeding $350." *Id.* Thus, in this circuit, the price of guiding services can serve as a proxy for market value under the Lacey Act, *id.* and guiding services of $3,000, the amount paid by Willis to Kirkland, provide adequate support for finding a market value in excess of $350. A reasonable jury thus could have found by this method that the value of the gar exceeded $350.

On the record before this court, the evidence was sufficient to support a finding that the market value of the gar exceeded $350, and thus the district court properly denied Willis's motion for a judgment of acquittal.

No. 12-41113

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.